UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONALD E. COLSON,

                              Plaintiff,

             -against-

WARDEN MINGO, CAPTAIN WILLIAMS,
CAPTAIN JOHNSON, CAPTAIN C. BELL,
CAPTAIN M. DANIELS, CAPTAIN M.
GUMS-FRANCIS, CAPTAIN W. ROSS, C.O.
K. ANDERSON, C.O. C. CARTER, C.O. A.
HENRY, C.O. O. HYPPOLITE, C.O. T.
JACKSON, C.O. E. LOPERA, C.O. D. ORTIZ
and THE CITY OF NEW YORK,
MUNICIPALITY,

                              Defendants.

18-CV-2765 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Incarcerated *pro se* Plaintiff Ronald E. Colson ("Plaintiff") brings this action for violation

of his Eighth Amendment rights, pertaining to unsafe conditions of confinement and excessive

use of force, against Defendants City of New York (the "City"), Warden Maxsolaine Mingo,

Captain Michael Williams, Captain Timothy Johnson, Captain Michelle Gumbs-Francis, Captain

Walter Ross, Captain Cheryl Bell, Captain Mark Daniels,  Correction Officer ("C.O.") Kevin

Anderson, C.O. Cedric Carter, C.O. Alason Henry, C.O. Oswald Hyppolite, C.O. Te-Art Jackson,

C.O. Edwin Lopera and C.O. Daniel Ortiz (the individual defendants collectively the "Individual

Defendants" and, together with the City, the "Defendants"). Pending before the Court is

Defendants' motion for summary judgment against Plaintiff's claims. For the reasons stated

herein, Defendants' motion is GRANTED in part and DENIED in part. Furthermore, the Court

*sua sponte* orders the appointment of *pro bono* counsel to assist Plaintiff for the purposes of

proceeding to trial.

## BACKGROUND

### A. Factual Background

On August 30, 2016, Plaintiff was detained at the Manhattan Detention Complex ("MDC"), in the custody of the New York City Department of Correction ("DOC") following criminal conviction. ECF No. 126 ("Statement of Materials Facts" or "SMF") ¶¶ 1–4; ECF No. 151. On that day Plaintiff was assigned for transfer to the Anna M. Kross Center ("AMKC"), a DOC facility located on Rikers Island. *Id*. ¶¶ 5–6. Plaintiff requested not to be transferred, based on his understanding of the dangerous conditions on Rikers Island, where Plaintiff had previously been incarcerated. ECF No. 131-6 at 58:24–60:1. Later that day, Plaintiff was placed on a bus with other incarcerated individuals to be transferred to Rikers Island. SMF ¶ 15.

Plaintiff had not taken his prescription blood pressure medication that morning because his last prescription had run out and had not yet been refilled. *Id*. ¶¶ 7–12. Plaintiff states that he informed multiple DOC personnel, including the officers on the bus, that he needed his prescription blood pressure medication, and that Captain Williams told Plaintiff that he would be provided his prescription medication if he got on the bus. ECF No. 131-6 at 40:15–44:10, 48:13–49:1. Plaintiff alleges that one of the officers under Captain Williams' supervision cursed at him for complaining about needing medical attention before getting on the bus. ECF No. 34 ("First Amended Complaint" or "FAC") ¶ 24.[1]  Plaintiff did not eat breakfast earlier that day and only ate cucumbers for lunch because he found the other food provided to be "not really edible." ECF

---

[1] The Court considers the FAC, which Plaintiff verified under penalty of perjury, as an affidavit for the purposes of summary judgment. *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.1 (S.D.N.Y. 2019) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)) ("[W]here a plaintiff 'verifies his complaint by attesting under penalty of perjury that the statements in the complaint are true to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes.'").

No. 131-6 at 55:10–56:15; SMF ¶¶ 13–14. Plaintiff testified that the next scheduled meal time at MDC was at 6:30 p.m., but that he and the other individuals being transferred were not given any food after approximately 11:30 a.m. on August 30, 2016 prior to being transferred. ECF No. 131-6 at 55:7–9, 56:10–15.

At approximately 7:00 p.m., Plaintiff and a number of other incarcerated individuals boarded a DOC transport bus at MDC, which contained broken glass on the floor and some seats. SMF ¶¶ 15, 18; ECF No. 131-6 at 86:23–24. DOC employees made efforts to locate another transport, but ultimately ordered Plaintiff and other incarcerated individuals to board the bus notwithstanding their complaints about broken glass and the unsanitary condition of the bus, including leftover trash and food waste, which were not cleaned up. ECF No. 131-6 at 86:13–22; 87:17–23, 93:3–14; ECF No. 131-7 at 21:20–23:3.

C.O. Munish Chopra, a non-party to this case, drove the bus to Rikers Island, and another correction officer[2] was the escort officer on the bus. SMF ¶ 20. The transport bus arrived at AMKC on Rikers Island at approximately 7:45–7:50 p.m., but none of the passengers were permitted to enter AMKC at that time. *Id*. ¶¶ 22–23. C.O. Chopra then drove the bus to the George R. Vierno Center ("GRVC") on Rikers Island to transfer the individuals who were assigned to be transferred to that facility, but the GRVC staff did not accept anyone on the bus for transfer. *Id*. ¶ 24. Plaintiff states that Captain Williams gave the order for the bus to stay on Rikers Island overnight instead of going back to MDC. ECF No. 131-6 at 72:13–73:4. Non-party Assistant Deputy Warden Enjoli Murria testified that the tour commander at AMKC is responsible for handling this type of situation when the bus has already left MDC. ECF No. 131-

---

[2] While Defendants now state that the identity of the other bus driver is unknown, Defendants previously confirmed in 2018 that C.O. Carter was the other bus driver. ECF No. 32 at 2; ECF No. 131-9 at 35:13–24.

10 at 24:24–25:15; ECF No. 148-2 at 1. C.O. Chopra and his partner[3] did not transfer any incarcerated individuals from the bus into any Rikers Island facilities that night, except for one passenger who was admitted to the Eric M. Taylor Center ("EMTC") around 11:00 p.m. or midnight. SMF ¶¶ 25–26; ECF No. 131-7 at 25:18–22. The officers on the bus indicated that Rikers Island does not accept admissions after 8:00 p.m, but that they also could not return to MDC. ECF No. 131-7 at 17:15–19, 27:23–28:10.

Plaintiff, along with other incarcerated passengers, was left to languish on the bus overnight, parked at Rikers Island, until the next morning. SMF ¶¶ 27–28. Plaintiff testified that he was suffering from nausea, dizziness, headache and overheating, and asked the officers on the bus for his prescription blood pressure medication or to take him to the medical facility, but was rebuffed in harsh terms. ECF No. 131-7 at 23:25–24:23; ECF No. 131-6 at 39:1–3, 40:15–18. While on the bus, Plaintiff did not have access to food, water or a bathroom. SMF ¶ 29. Without access to a bathroom, and at the indication of the officers on the bus, the incarcerated individuals on the bus were forced to use the back of the bus to urinate and defecate. SMF ¶¶ 29–31; ECF No. 131-7 at 30:20–31:4, 36:12–24. The passengers on the bus, including Plaintiff, vomited due to the odor of the buildup of urine and feces. SMF ¶ 32; ECF No. 131-7 at 35:14–24. They also repeatedly asked for food, water and access to a restroom, but none were provided. ECF No. 131-7 at 28:11–31:4.

Some of the incarcerated individuals (not Plaintiff) were placed in cages on the bus, and it appears there may have been a cage separating the officers on the bus from the passengers. SMF ¶ 56; ECF No. 131-6 at 82:21–22, 89:10–17; ECF No. 131-7 at 31:24–25, 41:12–14; ECF

---

[3] C.O. Chopra testified that he cannot recall the name or gender of the other officer on the bus with him that night, but Defendants previously represented to the Court in 2018 that C.O. Carter was the other bus driver. ECF No. 32 at 2; ECF No. 131-9 at 35:13–24.

No. 131-8 at 17:21–25, 22:25–23:11; ECF No. 131-13 at 27:9, 36:5–21, 37:24–25. The officers on the bus repeatedly got off and on the bus in order to, it appears, talk to other officers, use the restroom and get food, but none of the remaining passengers were permitted to disembark. ECF No. 131-7 at 16:22–19:25, 21:1–25, 23:1–25:25, 27:1–28:25, 30:1–31:15. Several passengers (not Plaintiff) suffered cuts from the broken glass, which moved around while the bus was in motion. ECF No. 131-7 at 39:20–40:24; ECF No. 131–6 at 87:3–7. Plaintiff was in handcuffs (as were all the incarcerated passengers), which he says were excessively tight, for the entire time on the bus. ECF No. 131-6 at 68:6–13, 82:14–15, 85:18–22; ECF No. 131-7 at 31:10–17.

At approximately 8:00 a.m. on August 31, 2016, C.O. Anderson and his partner[4] relieved C.O. Chopra and his partner from the transport bus while it was still parked at Rikers Island. SMF ¶¶ 33–34. Also that morning, personnel at AMKC were informed that passengers were refusing to get off of a bus that was parked outside their facility. *Id*. ¶¶ 35–37. Plaintiff maintains that he at no time refused to get off the bus, and that he told Warden Mingo that he wanted to get off the bus to use the bathroom. ECF No. 142 ("RSMF") ¶ 37; ECF No. 131-7 at 51:6–20. Several captains, including defendants Captain Johnson and Captain Gumbs-Francis, and AMKC Warden Mingo boarded the bus and spoke with the passengers at different times to try to convince or order them to get off the bus, and also notified the tour commander at AMKC of the situation.[5] SMF ¶¶ 39–40, 42; ECF No. 131-11 at 67:6–13, 69:13–24; ECF No. 131-12 at 40:3–10.

---

[4] Defendants now state that C.O. Carter relieved an unknown officer on the bus at approximately August 31, 2016, but Defendants previously confirmed in 2018 that C.O. Carter was the other bus driver. SMF ¶ 33; ECF No. 32 at 2; ECF No. 131-9 at 35:13–24.

[5] Captain Johnson and Captain Gumbs-Francis both testified that they could not recall the name of the AMKC tour commander at that time. ECF No. 131-11 at 69:21–24; ECF No. 131-12 at

According to Plaintiff, Captain Johnson threatened to have "the Bloods" hurt the passengers once they were inside AMKC. ECF No. 131-7 at 45:10–51:5. Warden Mingo told the passengers that the Emergency Services Unit ("ESU") was going to be called, and that a chemical agent would be used to get the passengers off the bus, but none of the passengers got up to exit the bus. SMF ¶ 42. The ESU team was called, presumably by Warden Mingo, to respond to the "hot bus," which refers to a DOC bus that requires ESU assistance. SMF ¶¶ 43–44; ECF No. 131-14 at 47:19–49:3; ECF No. 131-15 at 38:25–39:8.

At least five DOC personnel boarded the bus, including Captain Daniels, Captain Ross, C.O. Lopera, C.O. Ortiz and C.O. Henry, all of whom were present when a chemical agent, MK-9,[6] was deployed on the passengers of the bus. SMF ¶¶ 50–51, 57; ECF No. 131-13 at 37:8–38:15; ECF No. 131-15 at 49:8–10. Captain Daniels and Captain Ross tried to persuade or order the passengers to disembark before force was used, but no passengers got off the bus. SMF ¶ 51; ECF No. 131-13 at 27:14–15, 35:22–23. At least one passenger (not Plaintiff) threatened to cut

---

28:11–13. Captain Gumbs-Francis also testified that she could not recall the names of the officers on the bus. ECF No. 131-11 at 48:16–21, 65:6–9.

[6] New York City's Board of Corrections describes the chemical agent MK-9 as a "very powerful form of [pepper spray]" that "is prohibited [by DOC Directive 4510R-H, dated March 7, 2017] from being used against a single individual presenting passive resistance." See N.Y.C. Bd. Of Corr., AN ASSESSMENT OF THE USE OF CHEMICAL AGENTS IN NEW YORK CITY JAILS (Feb. 2024), available at https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/An-Assessment-of-the-Use-of-Chemical-Agents-in-NYC-Jails-Final.pdf (last visited Mar. 8, 2024) (the "BOC Chemical Agent Report"); *see also* ECF No. 131-8 at 25:1–9; ECF No. 131-15 at 37:11–24. It also describes the anticipated effects of exposure to pepper spray, which include: "swelling of the mucous membranes; immediate involuntary closing of the eyes; uncontrollable coughing; gagging; gasping for breath; and the sensation of intense burning of the skin and mucous membranes inside the nose and the mouth." *Id.*

C.O. Ortiz with broken glass if he opened the gate to the passenger cabin of the bus. SMF ¶ 52. One passenger (not Plaintiff) started to cut himself with broken glass. *Id*. ¶ 53.

C.O. Henry and C.O. Ortiz (wearing a mask) sprayed MK-9 on the passengers of the bus, which was ordered by Captain Daniels and possibly others. *Id*. ¶¶ 54–56; ECF No. 131-13 at 37:2–4; ECF No. 131-17; ECF No. 131-16. Plaintiff states that the first spray of MK-9 lasted longer than 30 seconds. ECF No. 131-8 at 22:2–21. Defendants Daniels, Ross and Ortiz noted only sprays of one to two seconds in duration in their use of force reports. ECF Nos. 131-16–131-18. The pepper spray affected all the passengers due to the small confines of the bus. ECF No. 131-13 at 36:24–37:1; ECF No. 131-20. After that first spray of the chemical agent, Plaintiff says he demanded to get off the bus, and then an officer told him to come up and sit towards the front of the bus, after which the officer sprayed Plaintiff with MK-9 for what felt like 30 seconds directly on Plaintiff's face, head, shoulders and upper body. SMF ¶ 63; ECF No. 131-8 at 22:22–23:4, 25:1–21. Plaintiff put his head down to try to avoid the effects of the pepper spray, as did all the passengers, but the chemical agent dripped down his head, neck, shoulders and back. ECF No. 131-16; ECF No. 131-8 at 25:14–21. Plaintiff alleges that one of the officers also hit him on the head with an MK-9 cannister. FAC ¶ 42.

After being pepper sprayed, the passengers tried to get air through the windows of the bus, but ESU officers in riot gear and face masks sprayed MK-9 through the windows from outside the bus. ECF No. 131-8 at 16:2–17:25, 20:11–22:21. Captain Bell, C.O. Hyppolite and non-party C.O. Green were among the eleven ESU officers who were at the scene. ECF No. 131-14 at 43:9–25; ECF No. 131-15 at 43:18–20. Plaintiff testified that one of the officers on the bus made a video recording of the incident using a handheld camera. ECF No. 131-8 at 16:13–17:6.

Plaintiff states that he sustained physical injuries in the form of "burned and bruised skin upon his head, face and body, as well as migraine headaches, dizziness and blurred vision." FAC ¶ 47. Plaintiff was taken off the transport bus and into AMKC but was not given medication, topical ointments or bandages to treat the parts of his body exposed to the chemical agent. SMF ¶ 65; ECF No. 131-8 at 27:21–28:6. Plaintiff alleges that he was kept on the bus for over sixteen hours in total. FAC ¶ 66. Once inside the facility, Plaintiff was permitted to shower within approximately one hour, and was permitted to wash himself with soap and water sometime before showering. SMF ¶¶ 66–67. Plaintiff states that the water in the shower was hot, which activated the effects of the residual chemical agent. ECF No. 131-8 at 29:23–25.

At approximately 3:08 p.m., Plaintiff received medical attention for exposure to a chemical agent. SMF ¶ 68. Other passengers were seen at the clinic as well, and medical staff noted visible injuries such as skin redness on some, while noting other complaints such as dizziness, burning sensations, and headaches from the chemical agent. *Id.* ¶ 69. The doctor's notes from Plaintiff's medical visit deferred diagnosis and noted no sign of injury, but Plaintiff maintains that he complained of burning skin, dizziness and headaches stemming from exposure to MK-9. SMF ¶ 70; RSMF ¶ 70; ECF No. 131-21. Plaintiff also states that he was not asked any follow-up questions about his injuries. ECF No. 131-8 at 33:13–15.

Plaintiff filled out a grievance form about the conditions of the bus overnight and the use of MK-9. SMF ¶ 83; ECF No. 128 ("Def. Mem.") at 4. The form is dated September 8, 2016. SMF ¶ 83. His grievance requested "the video footage that the E.S.U. Captain recorded of the incident preserved for litigation hold" and for a "detailed list" of the officers involved to be provided to him. ECF No. 131-25. DOC's Inmate Grievance Resolution Committee ("IGRC") does not have a record of receiving his grievance. SMF ¶ 84.

DOC's grievance procedures provide that incarcerated individuals can complain about any "issue, condition, practice, or action relating to the inmate's confinement" by filling out a written grievance form and submitting it to an IGRC staff member, dropping it off in the Grievance Box or bringing it the Grievance Officer. SMF ¶¶ 71–75. The DOC's grievance procedures, the Inmate Grievance Request Program ("IGRP"), provides a four-step process that is summarized in the Inmate Handbook. *Id*. The IGRP provides that IGRC staff will timestamp the grievance form upon receipt, issue the form a grievance/request reference number and provide the incarcerated individual with a copy of this time-stamped form as a record of receipt within two business days. *Id*. ¶ 76. If the incarcerated individual does not receive a response to their grievance within five business days, they can request a formal hearing, then appeal to the Warden, then appeal to the Central Office Review Committee ("CORC"), then appeal to the Board of Correction ("BOC"). *Id*. ¶¶ 77–81. Complaints of assault or use of force by a DOC staff person are not subject to this four-step IGRP grievance procedure; rather, incarcerated individuals can file a grievance about a use of force by DOC staff, and the IGRC will refer that grievance to the commanding officer for necessary action. *Id*. ¶ 82.

Plaintiff did not avail himself of the subsequent steps of the IGRP process prior to his transfer back to state custody on September 28, 2016. *Id*. ¶¶ 85–89. Plaintiff claims he was transferred from Rikers so that his grievance would not be entered or heard. ECF No. 131-6 at 65:18–23. As of October 1, 2020, Plaintiff represented that he still had "a skin condition, headaches, migraines, eye problems and nose bleeds" from which he did not suffer prior to the complained-of incidents of August 30–31, 2016. ECF No. 148-1 at 5.

### B.  Procedural History

Plaintiff was incarcerated at Clinton Correctional Facility in Dannemora, New York, when he commenced this action on March 21, 2018.[7] ECF No. 2; SMF ¶ 89. Plaintiff seeks damages for "physical injuries including, burned and bruised skin upon his head, face and body, as well as migraine headaches, dizziness and blurred vision" and emotional distress, as well as punitive damages, attorney's fees, costs and injunctive relief in the form of an investigation into the DOC. FAC ¶¶ 44–47, 49–50, 55, 59, 67, 75–78.

On August 25, 2018, the Court ordered Corporation Counsel for the City to ascertain the identities and badge numbers of the John Does that Plaintiff sought to sue in his original complaint pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997). ECF No. 8. In response to the Court's *Valentin* order, Corporation Counsel identified C.O. Henry, C.O. Ortiz, C.O. Carter, C.O. Anderson, Captain Williams and Captain Johnson, all of whom Plaintiff named as defendants in his First Amended Complaint – the operative complaint – which he filed on December 6, 2018. ECF Nos. 15, 21, 32 and 34. On October 29, 2018, the Court also ordered Defendants to, *inter alia*, "state whether [] there is any existing video of the incident alleged by Plaintiff to have occurred on August 31, 2016," in response to which Defendants represented that "there is no existing video footage of the incident(s) alleged by Plaintiff to have occurred on either August 30, 2016 or August 31, 2016 . . . ."  ECF Nos. 31, 32. Plaintiff was appointed limited *pro bono* counsel for the purposes of discovery, whose representation has since concluded upon the close of discovery. ECF Nos. 45, 60, 78, 117. Subsequently, Plaintiff moved for the appointment of new *pro bono* counsel, which was denied. ECF Nos. 118, 132. Plaintiff,

---

[7] As of the date of this Order, Plaintiff is incarcerated at Green Haven Correctional Facility in Stormville, NY.

not presently represented by counsel, filed a brief in opposition to Defendants' motion for summary judgment. ECF No. 141 ("Pl. Opp.").

Plaintiff states that he submitted a number of letters to BOC following up on his grievance after his transfer from AMKC, but counsel for Defendants indicated Plaintiff has not produced these letters in discovery.[8] Pl. Opp. at 3; ECF No. 148 ¶ 29; ECF No. 147 ("Def. R. Br.") at 4. At the court telephone conference held on March 14, 2019, Plaintiff reiterated his prior statement that an officer with a handheld camera recorded a video of the events on the bus occurring on August 31, 2016. ECF No. 148-3 at 3:6–14. Counsel for Defendants indicated, based on DOC policy and conversations with the officers involved, that "there was no video footage." *Id*. at 2:18–2:24; 3:7–3:22. Magistrate Judge Freeman observed that the parties' factual dispute could not be reconciled, in response to which counsel for Defendants offered to do "further digging" into the issue. *Id*. at 3:15–22. At the court conference on May 16, 2019, counsel for Defendants reiterated that, "according to the defendant officers, there was no handheld camera used during the incident" and counsel offered to follow-up with DOC again to confirm. ECF No. 52 at 4:3–24. Plaintiff states that he "submitted to Corporation Counsel all follow up letter[s] addressed to BOC" in regard to his grievance, in addition to multiple New York Freedom of Information Law ("FOIL") requests pertaining to the video of the August 31, 2016 incident that Plaintiff says was recorded by a DOC ESU officer. Pl. Opp. at 3.

On March 30, 2023, Defendants filed the instant motion for summary judgment. ECF No. 125. On June 12, 2023, Plaintiff sought leave to file a second amended complaint; the Court instructed Plaintiff that he "should seek leave for any amendment of the complaint in his

---

[8] Plaintiff states that he lost his bag of legal paperwork containing documents relevant to this action. ECF No. 131-8 at 80:8–15.

opposition" to Defendants' summary judgment motion, which Plaintiff did. ECF Nos. 135–136; Pl. Opp. at 4, 8.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. If the movant meets her initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citation omitted). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports her motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary

judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal citation omitted).

"Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must construe that party's submissions liberally and interpret them to raise the strongest arguments that they suggest.'" *Taylor v. Quayyum*, No. 16-CV-1143 (GHW), 2023 WL 5293383, at *5 (S.D.N.Y. Aug. 17, 2023) (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999)). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned." *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020).

## DISCUSSION

First, the Court addresses the requirements of the Prison Litigation Reform Act (the "PLRA"), finding that Defendants are not entitled to summary judgment on the basis of failure to exhaust administrative remedies. Next, the Court construes Plaintiff's First Amended Complaint as raising Eighth Amendment claims against Individual Defendants, with respect to conditions of confinement and excessive use of force, and municipal liability claims against the City pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Court dismisses Plaintiff's due

process clams because the events underlying this action occurred after Plaintiff was convicted. The Court then turns to Plaintiff's claims against Individual Defendants, finding that summary judgment is not appropriate at this time and that Plaintiff may file a second amended complaint. The Court is unable to determine at this juncture whether the City is entitled to summary judgment against Plaintiff's *Monell* claims and which Individual Defendants were not personally involved in the alleged constitutional violations, and thus denies without prejudice the motion in these respects. Finally, the Court *sua sponte* orders the appointment of *pro bono* counsel to assist Plaintiff for the purposes of proceeding to trial.

## I.      Exhaustion of Administrative Remedies Under the PLRA

The Court sets forth the legal standard for exhaustion of administrative remedies under the PLRA, as well as the specific procedure for such exhaustion set out by the DOC. Applying those standards here, the Court finds that Defendants are not entitled to summary judgment on their exhaustion of administrative remedies defense.

### A.  Statutory Exhaustion Requirement

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,'" or allege excessive force, the denial of adequate medical care or some other wrong. *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016).

"The PLRA requires 'proper exhaustion' of administrative remedies, meaning exhaustion in 'compliance with an agency's deadlines and other critical procedural rules.'" *Lucente v. County of Suffolk*, 980 F.3d 284, 311 (2d Cir. 2020) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). Proper exhaustion "means using all steps that the agency holds out, and doing so *properly . . . .*" *Woodford*, 548 U.S. at 90 (emphasis in original). To exhaust administrative remedies under the PLRA, an incarcerated individual must "complete the administrative review process in accordance with the applicable procedural rules – rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88).

However, incarcerated individuals need not comply with the exhaustion requirement when administrative remedies are "unavailable." *Ross v. Blake*, 578 U.S. 632, 642 (2016). An administrative procedure will be treated as unavailable for purposes of this exemption in at least three circumstances: (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 633–34). The Second Circuit has since reasoned that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Lucente*, 980 F.3d at 311–12 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004) (*abrogated on other grounds by Ross*, 578 U.S. at 635)).

**B.  DOC's Administrative Procedures**

Administrative grievance procedures at Rikers Island are governed by the IGRP. *Hickman*

*v. City of New York*, No. 20-CV-4699 (RA), 2021 WL 3604786, at *3 (S.D.N.Y. Aug. 12, 2021).

The Court takes judicial notice of the IGRP. *See Sanders v. City of New York*, No. 16-CV-7246

(PGG), 2018 WL 3117508, at *4 n.1 (S.D.N.Y. June 25, 2018) (cleaned up) ("It is a common

practice in this District to take judicial notice of the version of the IGRP in effect at the time of

the events giving rise to a prisoner's claim."). As DOC Directive 3376 ("IGRP Directive") was

the version of the IGRP in effect in August 2016, it is the governing administrative grievance

procedure in this action. *See* N.Y.C. Dep't of Corr., Directive 3376 (effective Sept. 10, 2012),

available at

https://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Prog

ram.pdf (last visited Mar. 8, 2024).

The IGRP provides a four-step administrative review and appeals process for grievances

from individuals incarcerated by the DOC:

> (1) file a complaint with the IGRP for informal resolution within ten [business]
> days of the alleged violation; (2) if unsatisfied with the disposition or a
> disposition has not been reached in a timely manner, request a hearing with the
> Inmate Grievance Resolution Committee ("IGRC") within five [business] days of
> the disposition; (3) appeal to the commanding officer of the facility, who must
> render a decision within five [business] days; and (4) if the inmate is still
> unsatisfied with the disposition, appeal to the DOC Central Office Review
> Committee ("CORC"), which must issue a recommendation within 15 [business]
> days.

*Groenow v. Williams*, No. 13-CV-3961 (PAC) (JLC), 2014 WL 941276, at *2 n.1 (S.D.N.Y. Mar.

11, 2014) (citing the IGRP Directive). An incarcerated individual "must take each of the four

steps to exhaust the administrative grievance process" unless administrative remedies are

"unavailable." *Sanders v. City of New York*, No. 16-CV-7426 (PGG), 2018 WL 3117508, at *4

n.2 (S.D.N.Y. June 25, 2018) (internal citation omitted). Some issues, including "complaints of assault or harassment by a staff person" and "allegations of staff-on-inmate use of force or harassment" are "non-grievable" and thus not subject to the four-step IGRP process. ECF No. 131-24 ("Inmate Handbook") at 21; IGRP Directive § IV(B)(2)(b)(ii). Where exhaustion of "the full suite of IGRP procedures [is] not required," an incarcerated person must still "file a formal grievance to exhaust all remedies." *House v. City of New York*, No. 18-CV-6693 (PAE), 2020 WL 6891830, at *9 (S.D.N.Y. Nov. 24, 2020). For grievances pertaining to "grievable" issues, "it is well established that, even if an inmate does not receive a response to his grievance, he fails to exhaust administrative remedies if he does not avail himself of the available appeals process." *Massey v. City of New York*, No. 20-CV-5665 (GBD) (DF), 2021 WL 4943564, at *7 (S.D.N.Y. Aug. 30, 2021) (cleaned up). "[I]t is also well settled that 'proper exhaustion' requires an inmate to not only file an initial grievance, but also to exhaust his claims through each level of the specified grievance process." *Id.*

### C.  Defendants Are Not Entitled to Summary Judgment on Exhaustion of Administrative Remedies Defense

Plaintiff maintains he filed a grievance by means of an Inmate Grievance and Request Program Statement Form on September 8, 2016, regarding the conditions of the bus and use of force to remove passengers from the bus. ECF No. 131-25 (the "Grievance"); SMF ¶ 83. DOC, however, maintains it never received it. SMF ¶ 84; Def. Mem. at 4, 8–9. Notwithstanding this factual dispute, Defendants move for summary judgment against Plaintiff's Eighth Amendment claims on the basis that Plaintiff did not exhaust administrative remedies by completing the IGRP appeals process. Def. Mem. at 7–10. Failure to exhaust administrative remedies under the PLRA is an affirmative defense. *See Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009). Because of the factual dispute and the other reasons detailed below, Defendants are not entitled to summary

judgment on their exhaustion of administrative remedies defense. *See Garcia v. Heath*, 74 F.4th 44, 48-49 (2d Cir. 2023) (factual dispute as to whether plaintiff exhausted PRLA remedies precluded summary judgment where "the record reflects a plausible inference that the prison officials failed to log [plaintiff's] grievance").

First, Plaintiff's excessive force claim is "non-grievable" under the IGRP. *See* IGRP Directive § IV(B)(2)(b)(ii); *Drew v. City of New York*, No. 16-CV-594 (AJP), 2016 WL 4533660, at *8 (S.D.N.Y. Aug. 29, 2016) (collecting cases finding that excessive force claims are non-grievable under the IGRP). Accordingly, Plaintiff was not required to exhaust "the full suite of IGRP procedures" other than the filing of a "formal grievance." *House*, 2020 WL 6891830, at *9. There is an issue of material fact as to whether Plaintiff filed a formal grievance and therefore exhausted administrative remedies with respect to this claim, which precludes summary judgment.

Plaintiff's conditions of confinement claims are "grievable" and thus "subject to the IGRP appeals process." *Taylor v. New York City Dep't of Corr.*, 849 F. App'x 5, 9 (2d Cir. 2021) ("Since the conditions-of-confinement . . . claims were grievable, and therefore subject to the IGRP appeals process, [Plaintiff]'s failure to appeal the non-responses to these grievances constituted a failure to exhaust his administrative remedies."). After filing his grievance on September 8, 2016, Plaintiff did not avail himself of the subsequent steps of the IGRP process prior to his transfer back to state custody on September 28, 2016. SMF ¶¶ 85–88. "Courts in this Circuit have consistently held that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-CV-7054 (RJS), 2015 WL 876464, at *4 (S.D.N.Y. Feb. 28, 2015); *see also Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6

(2d Cir. 2016) ("[M]any district courts have concluded that a 'nonresponse' to a grievance 'must be appealed' in order to exhaust administrative remedies under the PLRA.").

However, if "the regulatory scheme providing for [administrative] appeal is 'so opaque' and 'so confusing that . . . no reasonable prisoner can use it,'" then the exhaustion requirement may be excused. *Priatno*, 829 F.3d at 124 (quoting *Ross*, 578 U.S. at 644). Here, the relevant administrative procedures provide that IGRP staff will provide an informal resolution within five business days after receiving a grievance. IGRP Directive § II(F). "The IGRP contemplates that prison officials might not always respond to inmates' grievances. It sets forth the procedure to follow in such circumstances." *Taylor*, 849 F. App'x at 8. The procedure provides that "[i]n the event that the inmate does not receive a timely disposition at any stage of the IGRP process, the inmate may submit a request for an appeal (to proceed to the next step of the IGRP process)." IGRP Directive § IV(D)(10)(a). "Such an appeal shall be submitted no later than ten (10) business days following the date upon which a response was due from [DOC]." *Id.*

Because Plaintiff received no response to his grievance, the deadline for him to proceed to the next step of the IGRP process – filing an appeal to the warden or commanding officer of the facility – was September 29, 2016, fifteen business days after the date of his grievance. Plaintiff was transferred back to state custody on September 28, 2016, the day before his deadline for an administrative appeal elapsed. *See* SMF ¶ 88. DOC's administrative procedure provided that "[i]f appropriate, the grievance supervisor shall also forward the [final CORC decision] to the commanding officer of any facility to which the inmate has been transferred." IGRP Directive § IV(J)(5)(d). However, the procedure is silent as to what occurs in the event that the original facility takes no action in response to a grievance, and then the complainant is transferred to another carceral facility. Plaintiff still had time on the clock to appeal to the

commanding officer of AMKC when he was transferred to Downstate Correctional Facility in

Fishkill, New York on September 28, 2016. As Plaintiff correctly observes, DOC's grievance

procedures provide "no policy guidance that indicates how a prisoner can further pursue a

grievance in the event of a transfer to state prison" when that transfer occurs before any response

to the grievance is received. RSMF ¶ 78. DOC's grievance procedures "simply do not

contemplate the situation in which [Plaintiff] found himself, making it practically impossible for

him to ascertain whether and how he could pursue his grievance" after his transfer. *Priatno*, 829

F.3d at 124.

This is not a case in which Plaintiff "retained the ability to appeal his grievance to the

central office review committee even after he was transferred," *Richardson v. N.Y. State Dep't of

Corr.*, 633 Fed. App'x 816, 818 (2d Cir. 2016), because the next stage in the IGRP administrative

process – which is facility-specific – was to appeal to the commanding officer of AMKC. Such

appeal was rendered unavailable by Plaintiff's transfer to state custody. The IGRP procedures

"plainly do not provide guidance on how a transferred inmate can appeal his grievance with the

original facility without having received a response." *Priatno*, 829 F.3d at 126. As a result,

whatever administrative remedies were available to Plaintiff after his transfer, if any, were "so

opaque and confusing that they were, 'practically speaking, incapable of use.'" *Id.* (quoting *Ross*,

578 U.S. at 644). Accordingly, Defendants have not demonstrated that they are entitled to

summary judgment on their exhaustion of administrative remedies defense.

## II.     Plaintiff's Constitutional Claims Arise Under the Eighth Amendment

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff asserts causes of action for: (1)

excessive force; (2) deprivation of basic human need; (3) violation of due process; (4) municipal

liability for excessive force; (5) municipal liability for deprivation of basic human need; and (6) municipal liability for violation of due process. FAC ¶¶ 43–74.

Section 1983 provides "a species of tort liability in favor of persons deprived of federally secured rights." *Smith v. Wade*, 461 U.S. 30, 34 (1983) (cleaned up). A Section 1983 claim requires a plaintiff to show that "some person has deprived him of a federal right" and that such person "acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). It is undisputed that the Individual Defendants, as employees of DOC, were acting under color of state law during the relevant time period. Because Plaintiff asserts claims against several Individual Defendants and seeks monetary damages, he must also demonstrate that each officer was personally involved in depriving him of his constitutional rights. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases); *see infra* section VI. Because the events underlying the First Amended Complaint occurred after Plaintiff was convicted, rather than before trial, *see* ECF No. 151, the Court construes his First Amended Complaint as alleging violations of the Eighth Amendment guarantee of freedom from "cruel and unusual punishment," rather than violations of his due process rights. *See Morrison v. United States*, No. 17-CV-6779 (WHP), 2019 WL 5295119, at *4 (S.D.N.Y. Oct. 18, 2019) (collecting cases) ("While the constitutional status of convicted, but not sentenced, defendants remains an unanswered question in [the Second Circuit], district courts apply the Eighth Amendment, not the Fifth or Fourteenth Amendments, to individuals in [Plaintiff's] circumstance."); *see also Colds v. Smyth*, No. 22-CV-2023 (CS), 2023 WL 6258544, at *5 (S.D.N.Y. Sept. 26, 2023) (same).

Considering the solicitude afforded *pro se* litigants, the Court construes Plaintiff's First Amended Complaint as setting forth four cognizable Section 1983 claims: (1) an Eighth Amendment conditions of confinement claim based on the conditions on the bus; (2) an Eighth

Amendment excessive force claim based on the use of the MK-9 pepper spray; (3) a municipal liability claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) regarding conditions of confinement; and (4) a municipal liability pursuant to *Monell* regarding excessive use of force. Because the events underlying the First Amended Complaint occurred after Plaintiff was convicted, rather than before trial, Plaintiff's due process claims are dismissed.

## III.   Conditions of Confinement Claims

Considering Plaintiff's *pro se* status, the Court construes his First Amended Complaint as raising Eighth Amendment conditions of confinement claims related to (1) unsanitary conditions and (2) deprivation of food and water. Defendants argue that Plaintiff's conditions of confinement claims fail on the merits and that the Individual Defendants against whom the claims are asserted are entitled to qualified immunity. The Court first sets forth the legal framework that governs Plaintiff's Eighth Amendment conditions of confinement claims and then addresses each of the challenged conditions and Defendants' qualified immunity defense. The Court denies Defendants' summary judgment motion with respect to both challenged conditions.

### A.   Framework for Eighth Amendment Conditions of Confinement Claims

"The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "In prisons, inmates have the right to be free from conditions of confinement that impose an excessive risk to inmate health or safety." *Salgado v. DuBois*, No. 17-CV-6040 (NSR), 2019 WL 1409808, at *5 (S.D.N.Y. Mar. 28, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d

614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832). "The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to 'adequate food, clothing, shelter, sanitation, medical care and personal safety.'" *Rasheen v. Adner,* 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019) (quoting *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979)).

"To demonstrate that the conditions of [one's] confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (internal citation omitted). The plaintiff "must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)). "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id*. (citation omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (cleaned up). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" *Walker*, 717 F.3d at 125. (internal citation omitted). "'[T]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" *Id*. (internal citation omitted). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant'

may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."
*Id*. (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)).

"Conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Darnell*, 849 F.3d at 30 (quoting *Walker*, 717 F.3d at 125). "[T]he proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury." *Id*. "Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another." *Id*. at 32. "An overcrowded cell, for example, may exacerbate the effect of unsanitary conditions. Similarly, poor ventilation may be particularly harmful when combined with an overflowing toilet. Inadequate nutrition may be compounded by infestation." *Id*. The Court must consider the effects of the alleged deprivations with respect to both the "physical and mental soundness" of Plaintiff. *Willey v. Kirkpatrick*, 801 F.3d 51, 67 (2d Cir. 2015).

The Court applies the foregoing framework, requiring "deliberate indifference" with respect to a "sufficiently serious" deprivation, to both of the challenged conditions of confinement. *See Darnell*, 849 F.3d at 31–32. "Each of these conditions must be measured by its severity and duration, not the resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold." *Id*. at 32. Aside from contesting the "personal involvement" of certain Individual Defendants, which the Court addresses later (*see infra* section VI), Defendants contest only the objective prong, arguing that the deprivations Plaintiff suffered were not "sufficiently serious" to violate the Eighth Amendment. In the following subsections, the Court concludes that a reasonable jury could find that the deprivations Plaintiff suffered, if

proven, were sufficiently serious to violate the Eighth Amendment and that there is sufficient evidence in the record suggesting that at least some of the Individual Defendants knew of and disregarded excessive risks to Plaintiff's health and safety. The Court analyzes both challenged conditions in turn.

### B.  Unsanitary Conditions

"Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id*. at 30. The Second Circuit has "reiterated that the proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury." *Id*. Defendants argue that Plaintiff's exposure to unsanitary conditions does not implicate the Eighth Amendment because it lasted fewer than fifteen hours. Def. Br. at 15–16. While acknowledging that "there are many exposures of inmates to unsanitary conditions that do not amount to a constitutional violation," the Second Circuit has rejected the concept of "any bright-line durational requirement for a viable unsanitary-conditions claim" or "some minimal level of grotesquerie required." *Darnell*, 849 F.3d at 30–31 (citing *Willey*, 801 F.3d at 68). Instead, the Circuit instructs that "whether exposure to human waste is cruel and unusual depends on both the duration and the severity of the exposure." *Willey*, 801 F.3d at 68. If the circumstances are sufficiently severe, "an exposure to human waste [lasting] merely ten minutes" may violate the Eighth Amendment. *Id.* "The severity of an exposure may be less quantifiable than its duration, but its qualitative offense to a prisoner's dignity should be given due consideration." *Id*. The Court must consider the effects of the exposure to unsanitary conditions with respect to both the "physical and mental soundness" of Plaintiff. *Id.* at 67.

Moreover, "[r]easonably adequate sanitation and the ability to dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner." *Hart v. City of New York*, No. 11-CV-4678 (RA), 2013 WL 6139648, at *8 (S.D.N.Y. Nov. 18, 2013) (quoting *Odom v. Keane*, No. 95-CV-9941 (SS), 1997 WL 576088, at *5 (S.D.N.Y. Sept. 15, 1997)). Temporary denial of access to the restroom for short periods of time, without more, does not itself give rise to an Eighth Amendment claim. *See Livingston v. Hoffnagle*, No. 19-CV-353 (GLS) (CFH), 2019 WL 7500501, at *9 (N.D.N.Y. Nov. 8, 2019) (collecting cases). However, courts have found that extended denial of bathroom access, especially when coupled with unsanitary conditions, may give rise to an Eighth Amendment violation. *See May v. DeJesus*, No. 06-CV-1888 (AWT), 2010 WL 1286800, at *5 (D. Conn. Mar. 30, 2010) ("[C]ourts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health."); *Hart*, 2013 WL 6139648, at *7–8 (denying summary judgment on Eighth Amendment claim where plaintiff alerted officers to preexisting condition of frequent urination but was denied access to bathroom for twelve hours, forcing plaintiff to "repeatedly soil himself and remain[ ] imprisoned in urine-soaked clothing."); *DeBlasio v. Rock*, No. 09-CV-1077 (TJM), 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011) (denying defendants' motion for summary judgment as to conditions of confinement claim where plaintiff alleged that defendant correction officers handcuffed him behind his back and refused to remove his handcuffs so that he could use the bathroom for five hours, ultimately forcing him to urinate and defecate on himself). The court in *DeBlasio* found that "a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation." *Id*.

Here, it is undisputed that Plaintiff was handcuffed and denied access to the bathroom for at least fifteen hours. Without access to a bathroom, and at the indication of the officers on the bus, the incarcerated individuals on the bus were forced to use the back of the bus to urinate and defecate. SMF ¶¶ 29–31; ECF No. 131-7 at 30:20–31:4, 36:12–24. The passengers, including Plaintiff, vomited due to the odor of the buildup of urine and feces on the bus. SMF ¶ 32; ECF No. 131-7 at 35:14–24. These unsanitary conditions were further exacerbated by the lack of access to toilet paper and other hygienic materials because the "[a]vailability of hygienic materials is particularly important in the context of otherwise unsanitary living conditions." *Walker*, 717 F.3d at 127 (collecting cases finding that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation").

Moreover, "conditions that would normally have nothing to do with sanitation (for example, poor air circulation or being kept naked) can exacerbate the harmful effects of unsanitary conditions." *Darnell*, 849 F.3d at 31. Courts have recognized the danger to incarcerated individuals posed by confinement in close proximity to broken glass, especially alongside other unsanitary conditions, and that such circumstances may constitute inhumane conditions of confinement under the Eighth Amendment. *See Nur v. Hyatte*, No. 23-CV-512 (JD), 2023 WL 6382582, at *2 (N.D. Ind. Sept. 29, 2023) (confinement in dark cell "containing broken glass and another inmate's feces . . . trigger[ed] Eighth Amendment concerns"); *Walker-Abrams v. Baca*, No. 12-CV-21 (MMD) (CSD), 2022 WL 17494197, at *8–9 (D. Nev. Oct. 18, 2022), *report and recommendation adopted sub nom. Walker v. Baca*, No. 19-CV-21, 2022 WL 16744451 (D. Nev. Nov. 7, 2022) (finding that "a genuine dispute of material fact as to the existence of broken/cracked windows and associated shards of glass, whether they presented a safety hazard, and whether enough was being done to address this issue" precluded qualified

immunity defense and summary judgment against Eighth Amendment conditions of confinement claim); *Nelson v. Macauley*, No. 20-CV-70 (PLM), 2020 WL 2519841, at *2, 5–6 (W.D. Mich. May 18, 2020) (confinement to dirty cell covered in feces and with broken glass on the floor sufficient to state Eighth Amendment conditions of confinement claim).

In this case, the severely unsanitary conditions on the bus were further exacerbated by the presence of broken glass on the seats and floor of several rows of the bus, which moved around while the bus was in motion, forcing the passengers into even closer proximity to each other and their own human waste. *See* SMF ¶ 18; ECF No. 131-6 at 86:23–88:23. DOC employees made efforts to locate another transport, but ultimately ordered Plaintiff and other incarcerated individuals to board the bus notwithstanding their complaints about broken glass and the unsanitary condition of the bus, including leftover trash and food waste, which were not cleaned up. ECF No. 131-6 at 87:17–23, 93:3–14; ECF No. 131-7 at 21:20–23:3. Several incarcerated individuals (not Plaintiff) suffered cuts from the broken glass, which moved around while the bus was in motion. ECF No. 131-7 at 39:20–40:24; ECF No. 131–6 at 87:3–7. While there is no evidence that Plaintiff was cut by broken glass, the Court analyzes the dangerousness of the conditions of confinement as "measured by its severity and duration, not the resulting injury . . . ." *Darnell*, 849 F.3d at 32. If proven, a Hobson's choice between confinement in close proximity to a safety hazard and the debasement of close exposure to human waste is too degrading to be permitted and not one that today's society may tolerate.

Considered in the aggregate, *see Darnell*, 849 F.3d at 30, the Court finds that the unsanitary conditions here satisfy the objective prong for the purposes of summary judgment. While handcuffed on the bus for at least fifteen hours, Plaintiff was forcibly exposed, in close confines and amidst shattered glass, to his own human waste, as well as the buildup of the vomit,

feces and urine of other passengers, with no access to the bathroom, water or any hygienic materials. The Second Circuit has long established that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972). Notwithstanding Defendants' argument that the facts here do not cross a certain durational threshold – a bright-line approach to conditions of confinement claims explicitly rejected by the Second Circuit – the Court rejects "as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly" to keep incarcerated persons confined in close proximity to human waste overnight where mutually enforcing conditions exacerbate the severity of the risk to health and safety posed by those unsanitary conditions. *Gaston*, 249 F.3d at 166.

As to the subjective prong, for at least a subset of the Individual Defendants, there are ample facts in the record such that a reasonable juror could conclude that they were aware that Plaintiff and other passengers were exposed to severely unsanitary conditions and acted with deliberate indifference with respect to such deprivation. The passengers on the bus, including Plaintiff, repeatedly asked for food, water and access to a restroom but none were provided. ECF No. 131-7 at 28:11–31:4. The officers on the bus repeatedly got off and on the bus in order to, it appears, talk to other officers, use the restroom and get food, but none of the remaining passengers were permitted to disembark. ECF No. 131-7 at 16:22–19:25, 21:1–25, 23:1–25:25, 27:1–28:25, 30:1–31:15. Without access to a bathroom, and at the indication of the officers on the bus, the incarcerated individuals on the bus were forced to use the back of the bus to urinate and defecate, and the passengers on the bus, including Plaintiff, vomited due to the odor of the buildup of urine and feces. SMF ¶¶ 29–32; ECF No. 131-7 at 30:23–31:4, 35:14–24, 36:12–24.

Based on this record, a reasonable juror could conclude that at least some of the Individual Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" with respect to the unsanitary conditions, and indeed drew such an inference, but disregarded this substantial risk. *Bradshaw v. Uhler*, No. 21-CV-901 (DNH) (ML), 2023 WL 5795937, at *24 (N.D.N.Y. July 20, 2023), *report and recommendation adopted*, No. 21-CV-901, 2023 WL 5367520 (N.D.N.Y. Aug. 22, 2023) (quoting *Farmer*, 511 U.S. at 837).

### C. Deprivation of Food and Water

"[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983); *see also Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (quoting *Robles*, 725 F.2d at 15) ("'[A] substantial deprivation of food' can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment.").

Defendants argue that Plaintiff was not deprived of food and water for long enough to reach constitutional dimensions. Def. Br. at 13–14. Defendants characterize the time period Plaintiffs was confined on the bus as lasting no more than fifteen hours, while Plaintiff alleges that said confinement lasted over sixteen hours. Def. Br. at 13–16; FAC ¶ 66. Plaintiff testified that he was last provided food on August 30, 2016 at approximately 11:30 a.m. and that the next meal time at MDC was at 6:30 p.m. ECF No. 131-6 at 55:7–9, 56:10–15. The record does not reflect whether, and at what time, Plaintiff was ultimately provided access to food and drinking water after being admitted to AMKC on August 31, 2016. However, it is undisputed that Plaintiff was deprived of food and water for at least fifteen hours, and the Court cannot conclude as a matter of law that this deprivation did not rise to the level of a constitutional violation based on

duration alone, as deprivations of similar length have been found to reach constitutional implications. *See Simmons v. Kelly*, No. 06-CV-6183 (RJS), 2009 WL 857410, at *8 (S.D.N.Y. Mar. 31, 2009) (citing *Tavarez-Guerrero v. Toledo-Davila*, 573 F. Supp. 2d 507, 512–13 (D. P.R. 2008)) ("[C]ourts have held that a deprivation of as little as seventeen hours has constitutional implications.").

This is particularly true because the Court must analyze the seriousness of Plaintiff's deprivation of food and water, coupled with mutually enforcing conditions, with respect to *both* severity and duration. *Darnell*, 849 F.3d at 30. As discussed in the previous subsection, the concurrent deprivations that Plaintiff experienced – including severely unsanitary conditions stemming from exposure to human waste and shattered glass in close quarters and the denial of access to the bathroom and hygienic materials – exacerbated the severity of the threat to his health posed by the extended denial of food and water.

The denial of access to medical care further exacerbated the health risk created by the denial of food and water. "Cruel and unusual punishment in violation of the Eighth Amendment can take many shapes," including "deliberate indifference . . . to a prisoner's serious medical needs." *Walker v. Schult*, 45 F.4th 598, 610 (2d Cir. 2022); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (claims that prison officials intentionally disregarded an incarcerated individual's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment). The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 832, 844).

Generally, courts have found that missing a single dose of medication, without more, is not itself actionable. *See Constantino v. DiStefano*, No. 18-CV-5730 (BMC), 2020 WL 353094,

at \*5 (E.D.N.Y. Jan. 21, 2020) (collecting cases). However, it has also been recognized that "missing a single dose of [plaintiff's] hypertension medication" could, depending on the evidentiary record, lead to "a serious medical problem" for Eighth Amendment purposes. *Torres v. Trombly*, 421 F. Supp. 2d 527, 532–33 (D. Conn. 2006).

Here, Plaintiff testified that he was suffering from nausea, dizziness, headache and overheating – symptoms of hypertension – and asked the officers on the bus for his medication or to take him to a medical facility, but was rebuffed in harsh terms. ECF No. 131-7 at 23:25–24:23. The denial of blood pressure medication – while not on its own reaching constitutional dimensions – was a mutually reinforcing deprivation which "must be analyzed in combination, not in isolation" with the deprivation of food and water. *Darnell*, 849 F.3d at 32. The Court finds that denial of prescription blood pressure medication and medical treatment exacerbated the threat to Plaintiff's health posed by deprivation of food and water. Considering the facts in the light most favorable to Plaintiff, a reasonable juror could find that the deprivation of food and water, exacerbated by the severely unsanitary conditions and deprivation of medication and medical care, was sufficiently serious to violate the Eighth Amendment.

As to the subjective prong, for at least a subset of the Individual Defendants, there are ample facts in the record such that a reasonable juror could conclude that they were aware of the deprivation of food and water (based on the facts recited in the previous subsection) – as well as Plaintiff's medical needs – and acted with deliberate indifference with respect to such deprivation. Regarding medical needs, Plaintiff testified that he informed multiple DOC personnel, including the officers on the bus, that he needed his prescription blood pressure medication, and that Captain Williams told Plaintiff that he would be provided his prescription medication if he got on the bus. ECF No. 131-6 at 40:15–44:10, 49:13–49:1. Plaintiff alleges that

one of the officers under Captain Williams' supervision cursed at him for complaining about needing medical attention before getting on the bus. FAC ¶ 24. Another passenger was permitted to disembark the bus around 11:00 p.m. or midnight, but Plaintiff's request for medication or to be taken into the medical facility was rebuffed. SMF ¶¶ 25–26; ECF No. 131-7 at 23:25–24:23, 25:18–22.

Based on the factual record presented to the Court, a reasonable juror could conclude that at least some of the Individual Defendants knew of, and disregarded, an "obvious" and excessive risk to Plaintiff's health or safety posed by the denial food and water (as exacerbated by the severely unsanitary conditions and denial of medical care). *See Walker*, 717 F.3d at 125.

Thus, both challenged conditions – unsanitary conditions and deprivation of food and water – satisfy the objective prong for the purposes of summary judgment. And there is sufficient evidence in the record from which a reasonable juror could conclude that at least some of the Individual Defendants knew of and disregarded each of the excessive risks to Plaintiff's health and safety.

### D.  Qualified Immunity

Defendants assert that they are entitled to qualified immunity with respect to Plaintiff's conditions of confinement claims because "plaintiff staying on a bus overnight" was not "clearly established as unconstitutional." Def. Br. at 16. The Court disagrees.

"Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Walker*, 45 F.4th at 617 (internal citation and quotation marks omitted); *see also Smith v. Sullivan*, No. 20-CV-659 (DNH) (CFH), 2023 WL 3727447, at *18 (N.D.N.Y. May 3, 2023), *report and*

*recommendation adopted*, No. 20-CV-659, 2023 WL 3722137 (N.D.N.Y. May 30, 2023) (internal citation omitted) (applying the qualified immunity standard to correction officers). Qualified immunity does not shield government officials from liability when "(1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (internal citation omitted). "A right is clearly established when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.*, 64 F.4th at 434 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"In determining if a right is clearly established, this Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (internal citation omitted). The Supreme Court has made clear that its precedent does not "require a case directly on point" but that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Qualified immunity protects a government actor if it was "objectively reasonable for him to believe that his behavior did not violate the [plaintiff's] clearly established constitutional rights" at the time of the challenged act. *Lennon v. Miller*, 66 F.3d 416, 418 (2d Cir. 1995).

"A defendant is entitled to summary judgment on qualified immunity grounds when no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Id.* at 420 (cleaned up). It is well settled in the Second Circuit that a

defendant's ability to rely on qualified immunity from liability is a question of law for the court to decide on summary judgment only when "the factual record is not in serious dispute." *Id.*, 66 F.3d at 421.

In this case, Plaintiff's constitutional right to "humane conditions of confinement" and to be free from conditions of confinement which pose "an excessive risk to inmate health or safety" was clearly established at the time of the underlying incidents. *Farmer*, 511 U.S. at 837; *see also Helling v. McKinney*, 509 U.S. 25, 32 (1993) (incarcerated individuals are entitled to "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety"). As discussed in the foregoing sections, Plaintiff's constitutional right to humane conditions of confinement – including, and specifically, to be free from severe (1) unsanitary conditions and (2) deprivation of food and water – was clearly established at the time of the underlying incidents. "[T]he challenged conditions in this case, such as inadequate nutrition, and unsanitary conditions . . . are clearly covered by *Willey*." *Darnell*, 849 F.3d at 31 (citing *Willey*, 801 F.3d at 68–69). Moreover, *Willey* – decided by the Second Circuit in August 2015, well before the underlying incidents in this case in August 2016 – "was not breaking new ground, but rather reaffirming the law in this Circuit." *Id*. Accordingly, the rights Plaintiff seeks to vindicate through his conditions of confinement claims were clearly established at the time of the challenged conduct.

The facts here do not support summary judgment on qualified immunity. The Second Circuit has long established that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." *LaReau*, 473 F.2d at 978. While handcuffed on the bus for at least fifteen hours, Plaintiff was forcibly exposed, in close confines and amidst shattered glass, to his own human waste, as well as the buildup of the vomit, feces and urine of other passengers, with no access to the bathroom, water or any hygienic

materials. Unsanitary conditions of this severity – alongside the extended deprivation of food and water, which was exacerbated by the denial of medication or medical care – warrant denial of summary judgment on qualified immunity in light of the clearly established law of *Willey* on unconstitutional conditions of confinement.

There is sufficient evidence in the record that at least some of the Individual Defendants knew of and disregarded excessive risks to Plaintiff's health and safety. Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court concludes a rational jury could find that it was objectively unreasonable for at least some of the Individual Defendants to believe they were not violating Plaintiff's constitutional rights. With respect to the subjective prong of each challenged condition, the Court found that a reasonable juror could conclude that at least some of the Individual Defendants knew of, and disregarded, obvious and excessive risks to Plaintiff's health or safety which reached constitutional dimensions. This precludes summary judgment on qualified immunity. *See Roland v. City of New York*, No. 19-CV-2240 (PKC), 2023 WL 2599649, at *8 (E.D.N.Y. Mar. 22, 2023) ("[A] material factual dispute [] as to the subjective prong . . . preclude[s] a finding of qualified immunity at [summary judgment].").

Defendants' assertion of qualified immunity relies heavily on the duration of the challenged conditions, notwithstanding the Second Circuit's rejection of a bright-line durational threshold for such claims. *See supra* sections III(A)–(B). This does not suffice to establish summary judgment on qualified immunity, where it is undisputed that Plaintiff was deprived of food and water for at least fifteen hours and Plaintiff was forcibly exposed, in close confines and amidst shattered glass, to his own human waste, as well as the buildup of the vomit, feces and urine of other passengers, with no access to the bathroom, water or any hygienic materials. *See*

*Simmons*, 2009 WL 857410, at *8 (citing *Tavarez-Guerrero*, 573 F. Supp. 2d at 512–13) (because "courts have held that a deprivation of as little as seventeen hours has constitutional implications," the "length of Plaintiff's period of deprivation [of food and water] is an issue of material fact that will bear on whether Defendants are entitled to dismissal on qualified immunity grounds").

Whether all of the challenged conditions of confinement "combine to constitute an Eighth Amendment violation" and whether "Plaintiff's repeated complaints made Defendants aware of the substantial risk of harm, such that their failure to provide remedies amounted to deliberate indifference" – both of which find sufficient support in the record at this juncture – are ultimately "questions for a jury to decide." *Walker v. Schult*, No. 11-CV-287 (LEK), 2016 WL 4203536, at *14 (N.D.N.Y. Aug. 9, 2016) (denying summary judgment on qualified immunity). If Plaintiff's testimony is credited, he was denied food, water, prescription medication/medical treatment and access to the bathroom – and was confined in close proximity to broken glass (from which several passengers sustained injuries) and his and others' human waste – for at least sixteen hours. Further, if Plaintiff's testimony is credited, he suffered these deprivations despite his repeated pleas and with the awareness of multiple DOC employees at MDC, Rikers Island and on the bus. A reasonable juror, drawing all inferences in favor of Plaintiff, could find that it was objectively unreasonable to believe that these circumstances would not violate Plaintiff's constitutional right to be free from conditions of confinement that impose "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Thus, the Court denies summary judgment with respect to qualified immunity. *See Portillo v. Webb*, No. 16-CV-4731 (VEC) (GWG), 2022 WL 2337380, at *15 (S.D.N.Y. June 29, 2022) (denying summary judgment because "if [Plaintiff]'s version of events is believed, qualified immunity is inappropriate"); *see also Roland*

*v. City of New York*, No. 19-CV-2240 (PKC), 2023 WL 2599649, at *7 (E.D.N.Y. Mar. 22, 2023) ("A reasonable jury could credit Plaintiff's version of events; another could reject it as baseless. Conflicting versions of events, which find support in the record, require denial of summary judgment.").

Accordingly, the court DENIES Defendants' motion with respect to Plaintiff's conditions of confinement claims on both the merits and on qualified immunity grounds.

## IV.    Excessive Force

Plaintiff also asserts an Eighth Amendment claim for excessive use of force related to the use of MK-9, a very powerful form of pepper spray, on the bus. To state an Eighth Amendment excessive force claim, an incarcerated individual must allege that: (1) "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind," which is "characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63–64 (2d Cir. 2016) (internal citations and quotation marks omitted). "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as 'the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Id*. (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)).

Regarding the objective prong, "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Harris*, 818 F.3d at 64 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The objective prong "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury," *id.* (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999)), although "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at105 . Thus, the "core judicial inquiry" into a claim of excessive force is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quoting *McMillian*, 503 U.S. at 7).

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "As such, an officer who fails to intervene where he or she observes or has reason to know that excessive force is being used or a constitutional violation has been committed by a fellow officer is liable for the preventable harm caused by that officer." *Portillo*, 2022 WL 2337380, at *11 (citing *Anderson*, 17 F.3d at 557). "To be found liable for excessive force, [a defendant] must have either used excessive force himself or failed to intervene, despite having a 'realistic opportunity' to do so, to prevent another officer from applying excessive force." *McGrier v. City of New York*, 849 F. App'x 268, 272 (2d Cir. 2021) (citing *Anderson*, 17 F.3d at 557); *see also Randolph v. Griffin*, 816 F. App'x 520, 525 (2d Cir. 2020) (finding genuine issue of material fact precluded summary judgment on failure to intervene claims predicated on Eighth Amendment excessive force claims); *United States v.*

*Scott*, 833 F. App'x 884, 887–88 (2d Cir. 2020) (under the Eighth Amendment "[i]t is well-settled that an officer has a duty to intervene to protect an individual under the control and custody of the state from excessive force").[9]

"A correction officer's use of pepper spray may constitute an objectively serious, unnecessary, and wanton infliction of pain in violation of the Eighth Amendment." *Javier v. Russo*, No. 21-CV-7097 (VB), 2023 WL 5532468, at *7 (S.D.N.Y. Aug. 28, 2023); *see also Alston v. Daniels,* No. 15-CV-669 (CSH), 2015 WL 7257896, at *4 (D. Conn. Nov. 17, 2015) ("In the Second Circuit, a prison guard's use of a chemical agent . . . on an inmate may, under certain circumstances, constitute unnecessary and wanton infliction of pain in violation of the Eighth Amendment."); *Tracy v. Freshwater*, 623 F.3d 90, 98–99 (2d Cir. 2010) (denying summary judgment on excessive force claim under Fourth Amendment because plaintiff was pepper sprayed when he "had already been handcuffed and was offering no physical resistance of police commands").

It is clearly established in the Second Circuit that law enforcement may not use "significant force," including pepper spray, against a restrained individual who is not resisting and poses no threat to officers. *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) (citing cases); *see also Portillo*, 2022 WL 2337380, at *15. "In cases where a prison official uses a chemical spray against a compliant prisoner, the subjective element is satisfied when spraying the prisoner cannot be characterized as an attempt to maintain or restore discipline." *Baptiste v. Griffin*, No.

---

[9] District courts have relied on *Anderson* and its progeny in Eighth Amendment excessive force and failure to intervene cases involving corrections officers. *See, e.g.*, *Stephenson v. Davis*, No. 22-CV-644 (SVN), 2024 WL 50774, at *4 (D. Conn. Jan. 4, 2024); *see also Edrei v. Maguire*, 892 F.3d 525, 542 n.5 (2d Cir. 2018) (noting in the excessive force context that it is "the practice of the Supreme Court and this Circuit . . . [to] cross-pollinate between Fourth, Eighth, and Fourteenth Amendment [case law].").

18-CV-7274 (NSR), 2022 WL 2316184, at *4 (S.D.N.Y. June 28, 2022) (internal citation and

quotation marks omitted). As to the objective element, "there is a substantial body of case law"

documenting that exposure to pepper spray "causes 'a variety of incapacitating and painful

effects'" such that exposure to such chemical constitutes "more than a *de minimis* use of physical

force." *Rodriguez v. City of New York*, No. 14-CV-8647 (PGG), 2016 WL 5476003, at *6, 9

(S.D.N.Y. Sept. 29, 2016) (quoting *Toliver v. New York City Dep't of Corr.*, No. 10-CV-5355

(RJS), 2016 WL 4705166, at *3 (S.D.N.Y. July 29, 2016)) (denying summary judgment on the

merits and qualified immunity where "[d]efendants proceeded to use the chemical or pepper

spray in what reasonably can be inferred to have been an indiscriminate manner"). Accordingly,

correction officers may not use pepper spray "lightly or gratuitously" against unresisting

individuals who do not post an immediate threat. *Id*. at 9 (quoting *Tracy*, 623 F.3d at 98).

Here, Plaintiff testified that the first spray of MK-9 lasted longer than 30 seconds. ECF

No. 131-8 at 22:2–21. It is undisputed that the pepper spray affected all the passengers due to the

small confines of the bus. ECF No. 131-13 at 36:24–37:1; ECF No. 131-20. After that first spray

of the chemical agent, Plaintiff says he demanded to get off the bus, and then an officer told him

to come up and sit towards the front of the bus, after which the officer sprayed Plaintiff with

MK-9 for at least 30 seconds directly on Plaintiff's face, head, shoulders and upper body. SMF

¶ 63; ECF No. 131-8 at 22:22–23:4, 25:14–21. Plaintiff put his head down to try to avoid the

effects of the pepper spray, as did all the passengers, but the chemical agent dripped down his

head, neck, shoulders and back. ECF No. 131-16; ECF No. 131-8 at 25:14–21. Plaintiff alleges

that one of the officers also hit him on the head with an MK-9 cannister. FAC ¶ 42. After being

pepper sprayed, the passengers tried to get air through the windows of the bus, but ESU officers

in riot gear and face masks sprayed MK-9 through the windows from outside the bus. ECF No. 131-8 at 16:2–17:25, 20:11–22:21.

Aside from contesting the "personal involvement" of certain defendants, on which issue the Court reserves judgment, *see infra* section VI, Defendants' argument with respect to the excessive force claim is that Plaintiff's testimony is so "farfetched and inconsistent" that no rational juror could credit it. Defendants argue that, even viewing the facts in the light most favorable to Plaintiff, it is implausible that Plaintiff was pepper sprayed on his face because he put his head down. Def. Br. at 19–20. Defendants also argue that it requires a "suspension of disbelief" to credit Plaintiff's testimony that he suffered injury as a result of being pepper sprayed because the doctor's notes from Plaintiff's medical visit on August 31, 2016 noted no sign of injury. *Id.* at 20. These arguments miss the mark on several fronts.

First, Defendants improperly seek summary judgment based on facts that are in dispute. Plaintiff maintains that he complained of burning skin, dizziness and headaches stemming from exposure to MK-9 but was asked no follow-up questions about his injuries. SMF ¶ 70; RSMF ¶ 70; ECF No. 131-21; ECF No. 131-8 at 33:13–15. Defendants may argue to the jury that Plaintiff's version of events should not be believed, but this argument does not provide a basis for summary judgment. This argument goes to the credibility of Plaintiff's testimony, and "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

Second, Defendants' argument that no rational juror could credit Plaintiff's version of events – namely, that Plaintiff could not have been pepper sprayed on his face because he put his head down – misconstrues Plaintiff's deposition testimony and belies common sense. Def. Br. at

20. One can infer how Plaintiff, while handcuffed, could not protect parts of his face from being pepper sprayed, or how being pepper sprayed at close range on the head, shoulders and upper body – as Plaintiff testified he was – might result in chemical agent making contact with one's face. Moreover, Defendants' argument again improperly asks the Court to make credibility assessments that are the province of the jury. *See Baptiste*, 2022 WL 2316184, at *5 (denying summary judgment and qualified immunity in excessive force case regarding use of pepper spray where the credibility of plaintiff's "subjective self-serving statements" regarding what took place was an assessment reserved for the jury).

Third, Defendants argue for the first time in reply that "plaintiff cannot maintain an excessive force claim when he alleges to have suffered only incidental contact from and [sic] otherwise lawful use of chemical agent on other inmates." Def. R. Br. at 5. Defendants mischaracterize Plaintiff's testimony. Plaintiff testified that he was directly pepper sprayed on the face, head, shoulders and upper body. Moreover, this argument fails because there is no dispute that the use of pepper spray, which affected all the passengers due to the small confines of the bus, was intentional. *See Taylor v. Quayyum*, No. 16-CV-1143 (GHW), 2021 WL 6065743, at *5–6 (S.D.N.Y. Dec. 21, 2021) (plaintiff who was an "unintended victim of pepper spray targeted at another" adequately set forth an excessive force claim because the "use of force was intentional" and "objectively unreasonable"). The inquiry under the subjective prong of the excessive force analysis examines whether the use of force was intended, not whether the recipient was intended. *See Rodriguez*, 2016 WL 5476003, at *6, 8–9 (denying summary judgment and qualified immunity where the consequences plaintiff suffered from defendants' use of pepper spray against another individual in a confined space "would have been reasonably foreseeable" to defendant officers, regardless of whether plaintiff was an "unintended recipient

of force"). And, in any event, if a jury credits Plaintiff's testimony that an officer walked him to the front of the bus and pepper sprayed him directly or that ESU officers indiscriminately sprayed MK-9 through the windows of the bus, then he was certainly an intended recipient of force.

Fourth, Defendants mischaracterize the law of excessive force. That Plaintiff may not have suffered lasting injuries stemming from his exposure to MK-9 does not preclude his excessive force claim as a matter of law. *See Hudson*, 503 U.S. at 9 (internal citation omitted) ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident."); *Baptiste*, 2022 WL 2316184, at *4 (quoting *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987)) (rejecting defendant's argument that "Plaintiff suffered only temporary side effects as a result of the chemical agents" as a basis for summary judgment because "the Second Circuit has held that 'if the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe'"); *Jones v. Wagner*, No. 20-CV-00475 (VAB), 2022 WL 1525134, at *8 (D. Conn. May 13, 2022) (internal citation and quotation marks omitted) ("Although [the plaintiff's] medical records later show that his pain subsided, case law in this Circuit cautions wariness about granting summary judgment on this basis, on the ground that, if injuries of limited duration were enough to defeat an excessive force claim, police and corrections officers would essentially be able to utilize pepper spray and similar chemical agents with impunity."); *see also Flemming v. Kemp*, No. 09-CV-1185 (TJM) (DRH), 2012 WL 4094196, at *12 (N.D.N.Y. Aug. 30, 2012) ("A *de minimus* injury may still survive summary judgment if there was a malicious use of excessive force.").

44

Finally, summary judgment against Plaintiff's excessive force claim is particularly inappropriate in light of Plaintiff's testimony that he asked to get off the bus, and was restrained and complying with orders, when an officer brought him to the front of the bus and pepper sprayed him directly. A reasonable jury could credit Plaintiff's testimony in this regard – or with respect to the indiscriminate deployment of MK-9 through the windows of the bus – and conclude that certain Individual Defendants caused, or failed to intervene to stop, Plaintiff from being pepper sprayed when he was already complying, and that further use of the chemical agent against him under those circumstances was malicious and sadistic – in other words, for the purpose of causing harm. *See Jones v. Falco*, No. 20-CV-3485 (VB), 2022 WL 3668358, at *6 (S.D.N.Y. Aug. 25, 2022) (quoting *Wright v. Goord*, 554 F.3d at 268). ("[A] reasonable jury could credit plaintiff's testimony and conclude [defendant] administered pepper spray to plaintiff when he was already complying with the officers' directions, and thus administered pepper spray 'to cause harm maliciously and sadistically.'"). If such testimony is credited, use of pepper spray against Plaintiff under such circumstances "would run counter to clearly established Second Circuit law requiring that such substances 'not be used lightly or gratuitously' by police and corrections officers." *Rodriguez*, 2016 WL 5476003, at *9 (quoting *Tracy*, 623 F.3d at 98). If Plaintiff's testimony is credited, he did not threaten any corrections officers with harm, and in fact he asked to disembark the bus – both throughout the night and after the first burst of MK-9 – and was instead walked to the front of the bus and pepper sprayed directly and kept on the bus while MK-9 was sprayed through the windows. Under these circumstances, the Court cannot conclude as a matter of law that pepper spraying a handcuffed, unresisting individual in Plaintiff's position was not gratuitous (and therefore excessive) or that failing to intervene while a fellow officer did so was lawful. *See Edrei v. Maguire*, 892 F.3d 525, 543 (2d Cir. 2018)

(cleaned up) ("[B]ecause gratuitous force is unreasonable and therefore excessive, we presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee.").

Accordingly, the court DENIES Defendants' motion with respect to Plaintiff's excessive force claim.

## V.      Spoliation

In his opposition, Plaintiff requests "an adverse inference due to the missing video of the incident, which would quash any genuine dispute [of] material fact in regard[] to the force used against Plaintiff in this action." Pl. Opp. at 9. "An inference of spoliation can allow the nonmoving party to survive summary judgment 'in borderline cases' and 'in combination with some (not insubstantial) evidence' in the nonmoving party's favor." *Chloe v. DesignersImports.com USA, Inc.*, No. 07-CV-1791 (CS) (GAY), 2009 WL 1227927, at *9 (S.D.N.Y. Apr. 30, 2009) (quoting *Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)). In this case, the Court has resolved the summary judgment motion without need to reach spoliation, and the existence of a video of the events of August 31, 2016 is not a material fact at this stage; thus, the Court reserves judgment regarding any inference of spoliation.

## VI.     Personal Involvement Under Section 1983

The Court first sets forth the legal standard for "personal involvement" under Section 1983, then grants Plaintiff leave to amend his First Amended Complaint in order to conform his pleading to this standard.

### A.  Framework for Personal Involvement Under Section 1983

Because Plaintiff seeks monetary damages against Individual Defendants pursuant to Section 1983 claims, he must demonstrate that each officer was personally involved in depriving

him of his constitutional rights. *See Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013) (collecting cases). To establish such liability, Plaintiff must show that each "defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A plaintiff may establish personal involvement by showing that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Grullon*, 720 F.3d at 138 (2d Cir. 2013) (cleaned up). In the context of Section 1983 supervisory claims, a plaintiff "must demonstrate both that the defendant was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the defendant also drew the inference.'" *Elting v. Lassiter*, No. 22-CV-8573 (PGG), 2023 WL 8699454, at *5 (S.D.N.Y. Dec. 14, 2023) (quoting *Tangreti*, 983 F.3d at 619) (cleaned up).

## B.  Leave to Amend Complaint

Defendant seeks dismissal of this action with respect to all the Individual Defendants, except C.O. Ortiz and C.O. Henry, on the basis that they were not "personally involved" in the challenged conditions of confinement or use of force against Plaintiff. Def. Br. at 11–12, 18–19; Def. R. Br. at 1–2. Plaintiff seeks leave to amend his First Amended Complaint in order to name

the "proper defendants" with respect to each cause of action. Pl. Opp. at 4, 8. Defendants' motion is DENIED and Plaintiff's application is GRANTED as specified below.

Based on the present record, which omits, *inter alia*, considerable portions of Plaintiff's and other deponents' testimony, the Court is unable to clearly ascertain which defendants were not personally involved in the previously discussed conditions of confinement and use of force against Plaintiff. Having found sufficient evidence to support the objective seriousness of the deprivations Plaintiff suffered – which jeopardized Plaintiff's health and safety in ways that at least some individual DOC employees knowingly disregarded – the Court is mindful not to lightly extinguish the claims arising out of those deprivations based only on the need for an amended pleading, especially in light of Plaintiff's status as an incarcerated *pro se* litigant.

Moreover, the Court has concerns about the circumstances under which Defendants purport that *pro se* Plaintiff has "abandoned" almost all of his claims against the Individual Defendants. Def. R. Br. at 1–2. Defendants seek dismissal of Plaintiff's conditions of confinement claim against C.O. Carter for lack of personal involvement on the basis that C.O. Carter was not one of the bus drivers on August 30, 2016. Def. Br. at 12. However, Defendants previously confirmed in 2018 in their response to the Court's *Valentin* order – which provided the information Plaintiff used to amend his First Amended Complaint – that C.O. Carter was the other bus driver. ECF No. 32; ECF No. 131-9 at 35:13–24. On August 5, 2021 – thirty-two months after Plaintiff filed his First Amended Complaint, and twenty-four months after the three-year statute of limitations[10] for Plaintiff's Section 1983 claims elapsed – Defendants represented that "upon information and belief, defendants Carter and Anderson were not present on the bus

---

[10] *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015) ("Claims under § 1983 are governed by a three-year statute of limitations in New York.").

overnight . . . ." ECF No. 82 at 2 n.1–2. Defendants concede that they produced "supplemental disclosures identifying additional non-parties whom they learned were also present during the incident at issue in this case" as late as November 22, 2021, thirty-five months (December 2018 to November 2021) after Plaintiff filed his First Amended Complaint and twenty-seven months (August 2019 to November 2021) after the Section 1983 statute of limitations elapsed. Def. R. Br. at 10. Plaintiff appears to have in good faith credited Defendants' potentially erroneous (at least in part) representation in the instant motion practice that he named the wrong defendants in his First Amended Complaint. Pl. Opp. at 4, 8. Defendants characterize Plaintiff as having "abandoned" his excessive force claims except as to C.O. Ortiz and C.O. Henry, *see* Def. R. at 1–2, when, in actuality, Plaintiff requested that the Court defer disposition pending his second amended complaint, which he requested leave to file in accordance with prior order of the Court. Pl. Opp. at 8; ECF No. 135; ECF No. 138. Under these circumstances, and considering Plaintiff's *pro se* status, the Court will not dismiss Plaintiff's conditions of confinement and excessive force claims as to any of the Individual Defendants at this juncture.

Defendants contend that, to the extent Plaintiff wishes to add new defendants, any claims against such parties would be barred by the three-year statute of limitations for Section 1983 claims and would not "relate back" to the date of the original complaint. The Court reserves judgment[11] as to whether Plaintiff's claims, as amended, properly relate back to the date of the filing of the original complaint pursuant to Fed. R. Civ. P. 15(c)(1)(C) or New York Civil Practice Law and Rules Sections 203 or 1024 and whether the Individual Defendants named therein were personally involved in depriving Plaintiff of his constitutional rights. *See Burris v.*

---

[11] It would be premature for the Court to opine on relation back at this juncture. *See Young v. Lugo*, No. 18-CV-4216 (JS), 2023 WL 2624346, at *3 (E.D.N.Y. Mar. 24, 2023).

*Nassau Cnty. Dist. Att'y*, No. 14-CV-5540 (PKC), 2023 WL 6450398, at *13 (E.D.N.Y. Sept. 30, 2023) (internal citation omitted) ("Rule 15(c)(1)(A) directs courts to consider both federal and state law and apply whichever affords a 'more forgiving' principle of relation back.").

For the foregoing reasons, and in consideration of Plaintiff's *pro se* status, the Court GRANTS Plaintiff leave to file a second amended complaint to specify the proper defendants for each of his claims. To limit the scope of amendment at this late juncture, the Court only permits Plaintiff to assert each claim against those individuals who violated his constitutional rights, in the form of the challenged conditions of confinement on the bus or in pepper spraying him, by (1) directly causing, ordering or participating in such violation or (2) being made aware of the circumstances of such violation and failing to remedy it. The Court does not permit Plaintiff to amend to add any John Does or parties whose identities remain unknown. Plaintiff shall file his amended complaint no later than **June 6, 2024**.

### VII.   Municipal Liability (*Monell*)

Plaintiff brings municipal liability claims against the City, regarding conditions of confinement and excessive use of force, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A claim for municipal liability under Section 1983 requires a plaintiff to "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) [A] formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such

an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff must establish a causal link between the municipality's policy, custom or practice and the alleged constitutional injury. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue.").

The Court found that a reasonable juror could conclude that Plaintiff suffered certain deprivations that are objectively harmful enough to reach constitutional dimensions and that Individual Defendants are not entitled to summary judgment against Plaintiff's conditions of confinement and excessive force claims. The City argues that Plaintiff fails to (1) identify a policy or practice of the City that led to the violation of his constitutional rights, and (2) that such policy was the "moving force" behind the constitutional violations. Def. Br. at 22–23.

Without the benefit of counsel, Plaintiff does not bring to the Court's attention evidence establishing a municipal policy or custom. However, the Court declines to extinguish Plaintiff's *Monell* claims at this juncture, which are at least plausible based on the present record, notwithstanding its omission of considerable portions of deposition testimony and possibly other information adduced in discovery which may be favorable to Plaintiff. It is not clear whether, or to what extent, discovery pursuant to Plaintiff's *Monell* claims has taken place. The Court declines to adjudicate this issue without a fuller picture of the factual record pertaining to

Plaintiff's *Monell* claims, which Plaintiff would be better situated bring to the Court's attention with the benefit of *pro bono* counsel. *See infra* section VIII.

Based on the facts discussed in relation to Plaintiff's conditions of confinement and excessive force claims, Plaintiff's *Monell* claims may be meritorious. For instance, Defendants recite facts suggesting that the officers on the bus, per DOC policy, were unable to admit the passengers to any facilities on Rikers Island, let anyone off the bus, or return to MDC. SMF ¶¶ 22–28. If DOC has or had this practice – that when unable to admit transferees to Rikers Island that they cannot return to the transferring facility and may be confined to a transport overnight without access to food, water, lavatories or medical care – such practice may constitute the "moving force" behind any unconstitutional conditions of confinement here. Or, if DOC was aware of the repeated practice of the foregoing or similar, such that it knew similar conditions of confinement were likely to recur, and knowingly disregarded this risk by failing to adequately train its employees to discontinue this practice and adopt proper procedures to safeguard the health and safety of transferees, such failure may constitute the "moving force" behind the same.

Defendants also recite facts suggesting that the events of August 31, 2016, which culminated in officers pepper spraying Plaintiff and the other passengers, proceeded according to protocol for how to handle a "hot bus." SMF ¶¶ 42–46. If DOC has or had a consistent practice directing or permitting the indiscriminate or gratuitous use of MK-9 against all individuals on a "hot bus" – even individuals who are restrained, unresisting and pose no threat to officers – such practice may constitute the "moving force" behind any unconstitutional use of excessive force against Plaintiff here. Or, if DOC was aware of the repeated practice of the foregoing or similar, such that it knew similar use of force was likely to recur, and knowingly disregarded this risk by failing to adequately train its employees to discontinue this practice and adopt proper procedures

to protect individuals in Plaintiff's position from being pepper sprayed in an indiscriminate or gratuitous manner, such failure may constitute the "moving force" behind the same. This is particularly true here where it appears DOC has long been on notice of a practice of excessive use of chemical agents by corrections officers on Rikers Island against incarcerated individuals in violation of its own directives. *See* BOC Chemical Agent Report at 8–9 (providing an overview of the history of use of excessive force by DOC staff since well before the incident at issue here); *see also White v. City of New York*, No. 13-CV-7421 (KPF), 2015 WL 4601121, at *7, n.1 (S.D.N.Y. July 31, 2015) (considering Department of Justice findings letter which "detail[ed] the rampant use of excessive force at Rikers Island," including numerous instances of needless use of pepper spray). Because Plaintiff's *Monell* claims may be meritorious, and the Court cannot ascertain at this juncture whether there is evidence in the record to support them, or whether *Monell* discovery has even taken place, the Court is unable to determine whether the City is entitled to summary judgment against Plaintiff's *Monell* claims. Accordingly, the motion is DENIED without prejudice with respect to Plaintiff's *Monell* claims.

## VIII.   Appointment of Pro Bono Counsel

Following the withdrawal of limited *pro bono* counsel, whose representation concluded at the close of discovery, Plaintiff moved for the appointment of new *pro bono* counsel, which was previously denied. ECF Nos. 45, 60, 78, 117, 118, 132. In determining whether to grant an application for counsel, the Court must consider "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989) (per curiam). Other factors to consider include (1) the plaintiff's ability to investigate the crucial facts; (2) whether

conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact-finder; (3) the plaintiff's ability to present the case; (4) the complexity of the legal issues; and (5) any special reason in the case why appointment of counsel would be more likely to lead to a just determination. *See Hodge v. Police Officers*, 802 F.2d 58, 61–62 (2d Cir. 1986).

Having denied Defendants' summary judgment motion with respect to both the conditions of confinement and excessive force claims, and considering the factors set forth in *Cooper* and *Hodge*, the Court now finds it appropriate to appoint *pro bono* counsel to represent Plaintiff for the purposes of proceeding to trial, including the filing of a second amended complaint (*see supra* section V). As discussed in section VII, Plaintiff would also benefit from the assistance of *pro bono* counsel in bringing to the Court's attention any evidence establishing a municipal policy or custom with respect to his *Monell* claims. Plaintiff has not filed a new motion for the appointment of counsel, but the Court grants Plaintiff *pro bono* counsel *sua sponte*. *See Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 200 (2d Cir. 2010).

The Clerk of Court is directed to attempt to locate *pro bono* counsel to represent Plaintiff for the purposes of proceeding to trial. The Court advises Plaintiff that there are no funds to retain counsel in civil cases and the Court relies on volunteers. Due to a scarcity of volunteer attorneys, a lengthy period of time may pass before counsel volunteers to represent Plaintiff. If an attorney volunteers, the attorney will contact Plaintiff directly. There is no guarantee, however, that a volunteer attorney will decide to take the case, and Plaintiff should be prepared to proceed with the case without an attorney. The Office of Pro Se Litigation is respectfully requested to provide the Court with an update by **April 8, 2024**, as to whether an attorney is willing to represent Mr. Colson.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. For the reasons stated in Section II, Plaintiff's due process claims are DISMISSED. For the reasons stated in Sections III and IV, the motion is DENIED with respect to Plaintiff's conditions of confinement and excessive force claims. For the reasons stated in Section V, the Court reserves judgment on spoliation. For the reasons stated in Sections VI and VII, the motion is DENIED without prejudice with respect to Plaintiff's *Monell* claims and which Individual Defendants were not personally involved in the alleged constitutional violations.

Plaintiff's application for leave to file a second amended complaint, to specify the proper defendants for each of his claims, is GRANTED. As specified in section VIII, to limit the scope of amendment at this late juncture, the Court only permits Plaintiff to assert each claim against those individuals who violated his constitutional rights, in the form of the challenged conditions of confinement on the bus or in pepper spraying him, by (1) directly causing, ordering or participating in such violation or (2) being made aware of the circumstances of such violation and failing to remedy it. The Court does not permit Plaintiff to amend to add any John Does or parties whose identities remain unknown. The Court will also not reopen fact discovery absent good cause. Plaintiff shall file his amended complaint no later than **June 6, 2024**.

For the reasons stated in section VIII, the Clerk of Court is directed to attempt to locate *pro bono* counsel to represent Plaintiff for the purposes of proceeding to trial. The Office *of Pro Se* Litigation is respectfully requested to provide the Court with an update by **April 8, 2024**, as to whether an attorney is willing to represent Mr. Colson.

The Clerk of Court is directed to terminate ECF No. 25.

Dated: March 8, 2024
New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge